(No. 20173.—

MABEL ALLEN GREENLEES *et al.* Appellants, *vs.* LIBBIE C. ALLEN *et al.* Appellees.

*Opinion filed October 25, 1930.*

D. T. SMILEY, for appellants.

WILLIAM L. PIERCE, and E. H. WAITE, for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

This is an appeal from a decree of the circuit court of McHenry county in a proceeding to contest the will of Herbert W. Allen, deceased. The chancellor at the close of the evidence, on motion by the proponents of the will for an instruction to the jury to find the instrument in question to be the last will and testament of Herbert W. Allen, deceased, allowed that motion and so instructed the jury. Appellants bring the cause here, contending that there was evidence sufficient to go to the jury on the issues of mental competency of the testator and undue influence.

The following facts appear from the uncontradicted testimony: Herbert W. Allen for a number of years lived near Woodstock, Illinois. He was married but had no children. Early in August, 1926, he was taken to a hospital at Janesville, Wisconsin, suffering from a malady at that time diagnosed as gallstones. On the 7th of August following, an operation was performed for relief from this malady. It was then disclosed that he also had a cancer of the pancreas. He died on the 13th day of September, at the hospital. His widow, and appellants, who are his nieces, are his only heirs-at-law. On the 2d of September the will in question was made at the hospital. The witness Willard S. Battern, a justice of the peace of Woodstock, testified that he copied the will from three sheets of tablet paper on which the substance of the will was written, and that he received them from the widow, Libbie C. Allen. The evidence does not disclose who wrote the provisions of the will on those sheets of tablet paper.

At the time of the death of Allen his widow was seventy-two years of age, and her niece, Edith L. McCannon, and Bert McCannon, the latter's husband, assisted Mrs. Allen

in taking the deceased to the hospital. They rented a room across the street from the hospital, where Mrs. Allen remained during the time the deceased was in the hospital. During a part of this time her niece, Edith McCannon, was there with her. Mrs. Allen spent the daytime at the hospital with her husband. The influence charged is that Libbie C. Allen, the widow, and Edith L. McCannon and her husband, being the principal legatees under the will, used and exercised undue influence and resorted to falsehoods and misrepresentations as to appellants to procure the execution of the will.

The issue involved here is whether the court erred in instructing the jury to return a verdict upholding the will. The test of the existence of error in this regard is whether there is evidence in the record which, with all its reasonable inferences, taken in the aspect most favorable to the contestant, may be said to be sufficient in law to support the cause of action. (*Burns* v. *City of Chicago,* 338 Ill. 89; *Bailey* v. *Oberlander,* 329 id. 568.) The rule applied in some jurisdictions, that if there is any evidence—even a scintilla—tending to support plaintiff's case the cause must be submitted to the jury is not followed in this State, and we consider the more reasonable rule, and the one which has come to be established by weight of authority, to be as above stated. Under this rule, if the chancellor who heard the testimony was convinced that a verdict for the contestants must necessarily be set aside because the evidence, with all its reasonable inferences and intendments, does not so support the verdict, it then became the duty of the court to withdraw the issues from the jury and enter a finding. *Woodman* v. *Illinois Trust and Savings Bank,* 211 Ill. 578; *Bartelott* v. *International Bank,* 119 id. 259; *Simmons* v. *Chicago and Tomah Railroad Co.* 110 id. 340.

Concerning the circumstances under which the will was made and the mental competency of the testator, the witness Battern testified that he had known the testator for a num-

ber of years, having been a member of the Odd Fellows lodge and other organizations to which testator belonged; that there was nothing unusual about the latter's eyesight or his hearing; that in early August witness received a letter from testator's wife asking him to get some of testator's friends and come to the hospital in Janesville, as the testator wanted the witness to make his will; that he and the witnesses George Collen, Grover Wickham and Ernest Fues together drove to the hospital in Janesville, arriving there about 3:30 or 4:00 o'clock in the afternoon of September 2; that they met Mrs. Allen, who took the witness to her room across the street where she produced three sheets of tablet paper containing writing in pencil and asked the witness to copy Allen's will; that he copied the same in longhand and thereafter went back to the hospital, where he found the testator on a veranda of the second floor of the hospital in a wheel chair; that he shook hands with him, "bade him the time of day," and told him he had a copy of his will and asked him if he wished him to read it, and the testator replied that he did; that he read the instrument aloud; that he read all of it, and that at different places the testator interrupted him and asked him to go back a little and read it again, and that when he finished he asked him if that was his will and he nodded his head in assent, and that the witnesses Collen and Wickham were called in, and the testator said to them, "You boys will witness this for me?" and they answered "Yes," and he signed his name in the presence of the two witnesses and they signed as witnesses in his presence, and that the witness Battern then took the will home with him and kept it in his office until after the death of the deceased. He testified that testator did not look well physically but seemed to be all right mentally. This was likewise the substance of the testimony of Collen, Wickham and Fues as to what occurred at the time of the signing of the will. These witnesses all testified that they had known the deceased for a

number of years, had had conversations and transactions with him, and that at the time he signed his will, though he was weak physically, his mental condition was all right. Two of the nurses at the hospital testified to the condition of the deceased while at the hospital. Each described his physical condition and stated that he gradually grew worse until his death. By the testimony of these witnesses and the hospital chart it was shown that he was given on August 7, the day of the operation, one-fourth grain of morphine to alleviate pain, and for the first three days thereafter a like amount of morphine was administered, and that from August 10 until September 5 he received no morphine or other drug of that character. Eleven lay witnesses, all of whom testified that they had known the testator for years and either that they had been at the hospital to see the testator and talked with him or had previous business transactions with him, testified that in their opinion he was sane on the second day of September.

Appellants, as contestants, called the widow to the witness stand and showed by her that the deceased was her husband and that he had been married but once; that they had no children and that Edith L. McCannon was her niece. They also showed by her other facts of relationship as alleged in the bill, and that Mabel Hawver, who was a legatee under the will, had lived with them for some years during her childhood, though she was not related to them and was not adopted by them. Concerning the condition of deceased, the contestants introduced the testimony of Dr. T. W. Nuzum, the surgeon who performed the operation, who testified that during the time that he was in the hospital deceased was feeble mentally and physically. He stated that he did not think he could transact any important business; that he was under opiates most of the time; that he probably knew something about who his relatives were and whether he had money or not; that there was a good deal of time he was not mentally capable because he was

under the influence of opiates. It is disclosed, however, by the additional abstract filed by appellees, that the doctor did not know the mental condition of deceased on September 2 or have any judgment about it. He stated that if from August 10 to September 5 he took no drugs his mind would not be so affected on September 2. The additional abstract shows from the testimony of the nurses Elizabeth O'Connor and Ethel H. Grodivant, who identified the hospital records, that no opiates were given to the deceased between the 10th day of August and the 5th of September. This is the only testimony to which counsel refers as evidence of want of mental capacity and none other is disclosed by the record. It does not constitute such evidence, and there is no evidence in the record of want of mental capacity. It was proper to withdraw that issue from the jury.

The record also discloses no evidence that Edith L. McCannon had anything to do with the making of the will. It does show that she was in Janesville with Mrs. Allen during the first few days deceased was in the hospital and that she returned from time to time thereafter. The evidence also shows that the witness Battern procured the substance of the will from Mrs. Allen. The will gave the property to the widow during her lifetime, "with full right and authority to sell any part or parcel of the real estate or any or all of the personal property if she sees fit to do so." On her death the home was given to Edith L. McCannon and her husband, and various other bequests were made. The residue of his estate he directed to be divided among various nieces and nephews of the widow. There is no evidence as to who wrote the memorandum from which the will was drawn. The widow was on the stand as a witness for the contestants. No effort was made to procure from her the fact concerning that matter. The argument of appellants in support of the charge of undue influence is, that Edith McCannon was an overreaching,

dominating person, whose influence procured the writing of the will. The record is entirely barren of testimony from which the inference may be fairly drawn that she had anything to do with writing the will. At most it could be said that she was interested in having such a will drawn because she was one of the beneficiaries.

Counsel for appellants argues the fact that Mrs. Allen was constantly at the hospital during the illness of her husband as evidence of an attempt to overcome his will pertaining to the disposition of his property, to cause him to leave out of his will his nieces, who were natural objects of his bounty, and to give the property to the nephews and nieces of his wife. It seems a strange argument to say that the attentions of a wife of many years to her husband in his last illness are to be taken as evidence of undue influence on her part in the making of his will. These people had lived together for many years. She had assisted in the accumulation of this property. They had no children. The evidence shows appellants had not visited the home of the deceased and his widow since 1901. Her nieces and nephews were kind to him and showed affection for him. It was not unnatural that he should desire that the property accumulated by both should go to his widow during her lifetime and then to her relatives. Mere persuasion or advice or the influence of affection is not an improper influence in securing the execution of a will. Undue influence which justifies setting aside a will must be such as to deprive the testator of his free agency. It must be such as to destroy the freedom of his purpose and render the instrument more the will of another than of his own. It must be directly connected with the execution of the will and must operate at the time the will was made, producing a perversion of the testator's mind. Advice or persuasion will not vitiate a will freely and understandingly made. (*Flanigon* v. *Smith,* 337 Ill. 572; *Pollock* v. *Pollock,* 328 id. 179; *Grosh* v. *Acom,* 325 id. 474; *Jones* v. *Worth,*

319 id. 235; *Cunningham* v. *Dorwart,* 317 id. 451.) Evidence merely tending to prove a fiduciary relation is not sufficient to entitle a contestant to have the matter of undue influence submitted to the jury. Such evidence does not create a presumption of undue influence unless it is further shown that the fiduciary relation is used for the purpose of procuring the making of the will. *Grosh* v. *Acom, supra; Blackhurst* v. *James,* 304 Ill. 586; *Waterman* v. *Hall,* 291 id. 304.

There is in this record no evidence which, taken with all reasonable intendments, could be said to support the contention either that the testator was of unsound mind when the will was executed or that it was procured through undue influence. Courts may not speculate as to what might have been the facts in a case but the burden rests on the contestants to produce evidence of undue influence. This burden was not discharged. The chancellor was justified in taking the issue from the jury, and the decree will be affirmed.

*Decree affirmed.*